1  JONATHAN H. BLAVIN (State Bar No. 230269)
   jonathan.blavin@mto.com
2  NICHOLAS D. FRAM (State Bar No. 288293)
   Nicholas.Fram@mto.com
3  CORDELL A. BROWN (State Bar No. 356447)
   Cordell.Brown@mto.com
4  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
5  San Francisco, California 94105-2907
   Telephone:    (415) 512-4000
6  Facsimile:    (415) 512-4077

7  Attorneys for LinkedIn Corporation

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  LinkedIn Corporation,                    Case No. 3:25-cv-828

12              Plaintiff,                    **COMPLAINT FOR:**

13       vs.                                  **(1) BREACH OF CONTRACT;**
                                              **(2) FRAUD AND DECEIT (CAL. CIV.**
14  Nubela Pte. Ltd., Proxycurl LLC, Steven Goh, **CODE §§ 1572, 1710);**
15  and Bach Le,                              **(3) BREACH OF THE CONSUMER**
                                              **COMPUTER FRAUD AND ABUSE ACT,**
16              Defendants.                   **18 U.S.C. § 1030;**
                                              **(4) UNLAWFUL, UNFAIR OR**
17                                            **FRAUDULENT BUSINESS PRACTICES**
                                              **(CAL. BUS. & PROF. CODE § 17200 ET**
18                                            **SEQ.)**
                                              **(5) VIOLATION OF THE LANHAM ACT,**
19                                            **15 U.S.C. § 1125(C);**
                                              **(6) MISAPPROPRIATION**
20

21

22                                           **DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

COMPLAINT

Plaintiff LinkedIn Corporation ("LinkedIn" or "Plaintiff"), by and through its attorneys, brings this Complaint against Proxycurl LLC ("Proxycurl"), Nubela Pte. Ltd. ("Nubela"), Steven Goh, and Bach Le (collectively, "Defendants") for injunctive relief and damages.  LinkedIn alleges as follows:

1.    Defendants operate a business that is built on scraping LinkedIn member data.

2.    Defendants also operate a vast network of continuously-created fake accounts to scrape member data while logged in to LinkedIn.  LinkedIn's technical defenses regularly detect and restrict Defendants' fake accounts, but that has not stopped Defendants from continuing their scheme, registering hundreds if not thousands of new accounts *per day*.

3.    Defendants scrape member information that real people have posted on LinkedIn, including – via their fake accounts – data that is only available behind LinkedIn's password wall. Defendants are not shy about their behavior, but their public statements tell only half the story. Defendants freely acknowledge that they scrape "millions of [LinkedIn] profiles a day."[1]  And they admit that using fake accounts to scrape data that is kept behind a password wall is "not ok,"[2] as evidenced by a blog post from their website:

- Scrape LinkedIn profiles with fake logged-in accounts? **Not ok**.

But while they tell the world that the only information that they scrape is information that is "public",[3] that is not true: they also scrape information that is accessible only to logged-in members who can access member profiles behind LinkedIn's password wall, such as the profiles of members that have configured their profile settings to restrict the visibility of their entire profile to logged-in members only.

4.    Defendants do this while including LinkedIn's trademarks in materials on their website without authorization.  Doing so provides the false sense that LinkedIn is somehow

---

[1] https://nubela.co/blog/how-often-is-linkdb-updated/ (last accessed Jan. 10, 2025).
[2] https://nubela.co/blog/is-linkedin-scraping-legal/#what-now-can-i-scrape-linkedin (last accessed Jan. 10, 2025).
[3] https://nubela.co/proxycurl/linkedin (last accessed Jan. 10, 2025) (Defendant Proxycurl explicitly advertises its service as a "LinkedIn Profile Scraping API" which can be used to "[s]crape public LinkedIn profiles; get contact information; get venture funding data; [and] list jobs.").

associated with Defendants' unlawful business.  To be clear: there is no association or endorsement.  And what Defendants are doing is more than "not ok"—it is unlawful and must stop.

5.      LinkedIn brings this action to curb Defendants' unlawful behavior, preserve the integrity of its platform, and retain the trust of its members, who are at the heart of LinkedIn's platform.  Members create profiles on LinkedIn's platform to serve as their professional online identities.  Members share their information on LinkedIn in order to network with, and to be found by, real people—other professionals on LinkedIn—not bots.

6.      In order to protect the data that LinkedIn's members entrust to it, LinkedIn's User Agreement prohibits data "scraping": the accessing, extraction, and copying of data by automated bots.  It also prohibits impersonating others or creating fake accounts—accounts that are not backed by real people.  LinkedIn has invested significant technical and human resources to detect, limit, and block data scraping and fake accounts.  These measures are designed to ensure that LinkedIn's website is used for its intended purpose of facilitating meaningful professional connections between real people.

7.      LinkedIn's anti-scraping measures also help ensure that LinkedIn's members retain control over the information that they choose to publish about themselves on LinkedIn.  People and their careers evolve, and the information and vocabulary that people use to describe themselves and their experiences evolve as well.  It is important for members to be able to control their information and how they describe themselves.  That is why when members delete information from LinkedIn, LinkedIn deletes it too.

8.      Defendants' scraping activities undermine LinkedIn's members' privacy and control over their information.  Once Defendants have scraped LinkedIn members' data, that data can end up in any number of databases and end up used for any purpose, without LinkedIn's or its members' awareness.  Neither LinkedIn nor its members can then prevent Defendants or their customers from using that scraped data to send spam, from selling or inadvertently exposing member data to scammers, or from combining LinkedIn member data with other data to create

1    extensive private databases, among other activities.[4]

2    9.    Defendants' conduct, as alleged herein, constitutes unlawful acts of breach of

3    contract, fraud and deceit, and misappropriation, and violates the Lanham Act's prohibitions of

4    trademark dilution by disparagement (15 U.S.C. § 1125(c) et seq.), the Computer Fraud and Abuse

5    Act (18 U.S.C. § 1030), and California's Unfair Competition Law (Bus. & Prof. Code § 17200).

6    10.    Defendants' unlawful conduct has harmed and threatens the LinkedIn platform in

7    multiple ways.  It violates the trust that LinkedIn members place in the company to protect their

8    information.  Defendants sell LinkedIn members' personal data to third parties for profit,

9    depriving members of control over their personal data, and magnifying the harms that LinkedIn

10    has suffered.  Defendants' unauthorized scraping has also forced LinkedIn to expend time and

11    technical resources investigating and responding to their scraping, fake accounts, and other

12    misconduct.  Their fake accounts pollute the LinkedIn platform which is designed to be used by

13    real people.  Defendants' association of its scraping activities with LinkedIn's trademarks in its

14    marketing materials tarnishes LinkedIn's brand, falsely associating it with Defendants, when there

15    is no legitimate association.

16    11.    Defendants recently appear to have substantially increased the rate at which they

17    generate fake accounts.  Responding to such fraudulent activity will require a considerable

18    increase in the already marked expenditure of LinkedIn's time and technical resources.

19    12.    Defendants' activities, if not enjoined, threaten ongoing and irreparable harm to

20    LinkedIn, including to its reputation and substantial consumer goodwill.  LinkedIn brings this

21    lawsuit to stop Defendants' conduct, which harms LinkedIn's members and harms LinkedIn by

22    eroding the trust that lies at the core of LinkedIn's relationship with its members.  LinkedIn is also

23    entitled to actual damages and exemplary damages as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

25    13.    This Court has federal question jurisdiction over this action under 28 U.S.C. §§

26    1331 and 1338 because this action alleges violations of the Lanham Act (15 U.S.C. § 1051 et seq.)

_____

28    [4] *See, e.g.*, https://www.datavisor.com/wiki/web-scraping/ (describing various fraudulent activities individuals in possession of scraped data can engage in) (last accessed Jan. 10, 2025).

and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).  The Court has supplemental jurisdiction over LinkedIn's state law claims under 28 U.S.C. § 1367, because they arise out of the same nucleus of operative facts as the claims based on federal law.

14.    This Court also has diversity jurisdiction over this action under 28 U.S.C. § 1332. Plaintiff is a citizen of Delaware and California.  Upon information and belief, Defendants are citizens of Wyoming and Singapore.  The amount in controversy exceeds $75,000.

15.    Venue is proper in this Court because Defendants contractually consented to venue in this District.  Defendants have consented to LinkedIn's User Agreement,[5] which contains a forum selection clause selecting this judicial district for resolution of all disputes between the parties.

16.    Venue is also proper because Defendants Nubela and Proxycurl have consented to LinkedIn's terms for Pages (the "Pages Agreement"[6] ), which apply to all members and organizations who maintain a Company Page on LinkedIn's website.  The Pages Agreement also contains a forum selection clause selecting this judicial district for resolution of all disputes between the parties.

17.    During all relevant times, Defendants have repeatedly, knowingly, and intentionally targeted their wrongful acts at LinkedIn, which is headquartered in this judicial district.  In addition, Defendants have consented to personal jurisdiction in this judicial district by consenting to the forum selection clauses in LinkedIn's User Agreement and Pages Agreement.

## INTRADISTRICT ASSIGNMENT

18.    This case is an intellectual property action, to be assigned on a districtwide basis per Civil Local Rule 3-2(c).

## THE PARTIES

19.    LinkedIn Corporation is a Delaware corporation with its principal place of business in Sunnyvale, California.

---

[5] https://www.linkedin.com/legal/user-agreement (last accessed Jan. 10, 2025).
[6] https://legal.linkedin.com/linkedin-pages-terms (last accessed Jan. 10, 2025).

20.    Defendant Proxycurl is a Wyoming corporation with its principal place of business in Cheyenne, Wyoming.

21.    Defendant Nubela is a company incorporated under the laws of Singapore in August 2014.  Nubela's principal place of business is in Singapore.

22.    Defendant Steven Goh is the founder and Chief Executive Officer of Nubela and Proxycurl. On information and belief, he is a national of Singapore, where he resides.  Goh registered his LinkedIn account on March 21, 2010.  He is responsible in whole or in part for the wrongdoing alleged herein, and in his capacity as a principal of Nubela and Proxycurl.

23.    Defendant Bach Le is the Chief Technology Officer of Proxycurl. On information and belief, he is a national of Singapore, where he resides.  Le registered his LinkedIn account on August 13, 2021.  He is responsible in whole or in part for the wrongdoing alleged herein, and in his capacity as a principal of Proxycurl.

24.    On information and belief, at all times material to this suit, each Defendant was the agent, employee, partner, alter ego, or coconspirator of and with the other Defendants, and the acts of each Defendant were in the scope of that relationship.  In conducting the acts and omissions as alleged in this Complaint, each Defendant acted with the knowledge, permission, and the consent of each of the other Defendants.

25.    LinkedIn reserves the right to amend its complaint should discovery reveal that Defendants are working in concert with one or more people or entities.

## FACTS

### The LinkedIn Network

26.    LinkedIn, a global online social network with a professional focus, has over one billion members in over 200 countries and territories around the globe.  Its mission is to connect the world's professionals to make them more productive and successful.  Through its proprietary platform, LinkedIn allows its members to create, manage, and share their professional histories and interests online.

27.    Through its proprietary platform, LinkedIn members are able to create, manage, and share their professional identities online, build and engage with their professional network,

access shared knowledge and insights, and find business opportunities, enabling them to be more productive and successful.  LinkedIn's broader vision is to create economic opportunity for every member of the global workforce.

28.     At the heart of LinkedIn's platform are its members, who create individual profiles that serve as their professional profiles online.  LinkedIn is available at no cost to anyone who wants to join and who consents to the terms of LinkedIn's User Agreement, Privacy Policy, and Cookie Policy.

**Member Privacy Choices**

29.     LinkedIn members populate their profiles with a wide range of information concerning their professional lives, including summaries (narratives about themselves), job histories, skills, interests, educational background, professional awards, photographs, and other information.  Members may customize some of their profile settings, within boundaries set by LinkedIn, to decide how much of their profile information may be viewable to users who are not logged-in to LinkedIn.  Some members may even decide to prevent their profiles from appearing at all in public search engine results.[7]  Some information is not subject to these settings and can only be viewed by people who have logged into LinkedIn.

30.     The privacy choices that LinkedIn offers its members are critical to their decisions to entrust information to LinkedIn and to LinkedIn's platform.  In its Privacy Policy, LinkedIn sets limits regarding what LinkedIn can and cannot do with member data.  The Privacy Policy also promises that if a member decides that he or she wants to delete his or her profile, LinkedIn will permanently delete the account and all of the data that the member posted to LinkedIn within 30 days.  LinkedIn thus ensures that members have ultimate control over their information, by giving members the ability to customize how much information is available and to whom, and the ability to remove their information entirely from LinkedIn's platform if they so decide.

31.     LinkedIn has invested and plans to continue to invest substantial time, labor, skill, and financial resources into the development and maintenance of the LinkedIn site and platform

---

[7] See https://www.linkedin.com/help/linkedin/answer/a518980/ (last accessed Jan. 10, 2025).

**LinkedIn's Marks**

32.     LinkedIn is the owner of several registered trademarks in graphic logos that it uses to advertise, market, and promote the LinkedIn brand. LinkedIn is the owner of the following marks in International Class 9:

U.S. Registration No. 4,023,512 for LINKEDIN

U.S. Registration No. 3,971,642 for 

U.S. Registration No. 4,023,511 for 

U.S. Registration No. 4,023,513 for 

(collectively, the "Class 9 Marks") in connection with "Computer software for the collection, editing, organizing, modifying, bookmarking, transmission, storage and sharing of data and information in the fields of business and social networking, employment, careers and recruiting; downloadable electronic publications in the nature of newsletters, research reports, articles and white papers on topics of professional interest, all in the fields of business and social networking, recruiting and employment, and personal and career development; computer software development tools for business and social networking; computer software that provides web-based access to applications and services through a web-operating system or portal interface" in International Class 9.

33.     LinkedIn has used the Class 9 Marks in interstate commerce in connection with the registered goods continuously since at least as early as April 30, 2007.  A copy of the Certificates of Registration for the Class 9 Marks is attached as Exhibit A.  The registrations for the Class 9 Marks are valid, subsisting and incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.  LinkedIn's use and registration of the Class 9 Marks predate Defendants' unauthorized use of LinkedIn's mark.  Accordingly, LinkedIn has priority of rights in the Class 9 Marks.

LinkedIn is the owner of the following marks in International Class 35:

U.S. Registration No. 3,963,244 for LINKEDIN

U.S. Registration No. 3,959,413 for 

U.S. Registration No. 3,959,419 for 

U.S. Registration No. 3,959,420 for 

(collectively, the "Class 35 Marks") in connection with "Advertising and marketing services, namely, promoting goods and services for businesses; providing an online searchable database featuring employment and career opportunities and business, employment and professional queries and answers; job placement services, human resources consulting services; business research and survey services; promoting the goods and services of others via a global computer network; advertising, marketing and promotional services related to all industries for the purpose of facilitating networking and socializing opportunities for business purposes; charitable services, namely, promoting public awareness about community service; providing online career networking services and information in the fields of employment, recruitment, job resources, and job listings; personnel recruitment and placement services; electronic commerce services, namely, providing information about products and services via telecommunication networks for advertising and sales purposes; providing networking opportunities for individuals seeking employment; on-line professional networking opportunities; providing online computer databases and online searchable databases in the fields of business and professional networking" in International Class 35.

34.    LinkedIn has used the Class 35 Marks in interstate commerce in connection with the registered services continuously since at least as early as July 31, 2008.  A copy of the

Certificates of Registration for the Class 35 Marks is attached as Exhibit B.  The registrations for the Class 35 Marks are valid, subsisting and incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.  LinkedIn's use and registration of the Class 35 Marks predates Defendants' unauthorized use of LinkedIn's mark.  Accordingly, LinkedIn has priority of rights in the Class 35 Marks.

LinkedIn is the owner of the following marks in International Class 42:

U.S. Registration No. 3,967,561 for LINKEDIN

U.S. Registration No. 3,979,174 for 

U.S. Registration No. 3,971,641 for 

U.S. Registration No. 3,971,640 for

(collectively, the "Class 42 Marks") in connection with "Computer services, namely, hosting electronic facilities for others for organizing and conducting meetings, events and interactive discussions via the Internet; computer services, namely, creating an on-line community for registered users to organize groups, events, participate in discussions, share information and resources, and engage in social, business and community networking; providing temporary use of online non-downloadable software for allowing web site users to communicate information of general interest for purposes of social, business and community networking, marketing, recruitment and employment; providing a website featuring temporary use of non-downloadable software enabling users to search, locate and communicate with others via electronic communications networks to network, conduct surveys, track online reference to job opportunities and business topics; computer services in the nature of customized web pages featuring user-defined information, personal profiles, and images; scientific and industrial research in the fields

of business and online social networking; providing a web site featuring temporary use of non-downloadable software allowing web site users to post and display online videos and photos for sharing with others for entertainment purposes; computer services, namely, creating an online community for registered users to participate in discussions, get feedback from their peers, form virtual communities, and engage in social networking featuring social media including photos, audio and video content on general topics of social interest" (or a substantially similar description) in International Class 42.

35.    LinkedIn has used the Class 42 Marks in interstate commerce in connection with the registered services continuously since at least as early as July 31, 2008.  A copy of the Certificates of Registration for the Class 42 Marks is attached as Exhibit C.  The registrations for the Class 42 Marks are valid, subsisting and incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065.  LinkedIn's use and registration of the Class 42 Marks predates Defendants' unauthorized use of LinkedIn's mark.  Accordingly, LinkedIn has priority of rights in the Class 42 Marks.

36.    Collectively, the marks asserted in paragraphs 32 through 36 of this Complaint, which are representative examples of LinkedIn's trademark registrations, are referred to as the "LinkedIn Marks."

37.    As a result of LinkedIn's substantial expenditure of time, labor, skill, and financial resources into its platform, the LinkedIn Marks and LinkedIn's goods and services have developed substantial goodwill.

38.    The LinkedIn Marks have been distinctive and famous in the United States long before Defendants engaged in the illicit activity described below.

### LinkedIn's Prohibitions on Data Scraping, Fake Accounts, and Other Harmful Conduct

39.    LinkedIn's User Agreement[8] prohibits scraping member data from LinkedIn's

---

[8] *See* https://www.linkedin.com/legal/user-agreement (last accessed Jan. 10, 2025).  Defendants also agreed to substantially similar terms at the time they signed up for their LinkedIn accounts.

1   website through any means.

2       40.     LinkedIn's User Agreement explains that members, users, and visitors to the

3   LinkedIn website must abide by certain restrictions in accessing and using the website.  The

4   current version of the User Agreement, effective November 20, 2024, states that "By creating a

5   LinkedIn account or accessing or using our Services …, you are agreeing to enter into a legally

6   binding contract with LinkedIn (even if you are using third party credentials or using our Services

7   on behalf of a company)."  Each Defendant has either consented to this current version of the User

8   Agreement or has consented to a prior version of the User Agreement containing substantively

9   identical language.

10      41.     Defendants Goh and Le bound themselves to the User Agreement when they

11  created their individual member profiles on LinkedIn.  As demonstrated by the screenshot below, a

12  prospective member registers for an account by providing an email address and password.  By

13  clicking "Agree & Join," the prospective member "agree[s] to the LinkedIn User Agreement,

14  Privacy Policy, and Cookie Policy," all of which are hyperlinked on the page.

42.     Nubela and Proxycurl have also created, and have actively maintained, Company Pages on LinkedIn.  Defendants created the Nubela company page on July 24, 2019.[9]  In so doing, a representative of Defendants checked a box stating that "I verify that I am an authorized representative of this organization and have the right to act on its behalf in the creation and management of this page.  The organization and I agree to the additional terms for Pages."

43.     Defendant Goh was later made an admin for the Nubela company page.  Once made an admin, Goh received email notice of the additional terms that applied for Pages.

44.     Defendants created the Proxycurl company page on September 19, 2022.  In so doing, a representative of Defendants checked a box stating that "I verify that I am an authorized representative of this organization and have the right to act on its behalf in the creation and management of this page.  The organization and I agree to the additional terms for Pages."

45.     The Pages Agreement states that "the LinkedIn User Agreement, Privacy Policy, and Cookie Policy apply to any use of our services," and contains hyperlinks to the pertinent documents.

46.     Section 2.1 of the User Agreement prohibits users from "creating an account with false information." The section states, in relevant part:

> To use the Services, you agree that: (1) you must be the "Minimum Age"(described below) or older; (2) you will only have one LinkedIn account, which must be in your real name; and (3) you are not already restricted by LinkedIn from using the Services. **Creating an account with false information is a violation of our terms**, including accounts registered on behalf of others or persons under the age of 16.

47.     Section 8.2 of the User Agreement prohibits those who are bound to the agreement from engaging in any of the following activities:

---

[9] Only LinkedIn members who have agreed to the LinkedIn User Agreement can create Company Pages.

- "Creat[ing] a false identity on LinkedIn, misrepresent[ing] your identity, creat[ing] a Member profile for anyone other than yourself (a real person), or us[ing] or attempt[ing] to use another's account (such as sharing log-in credentials or copying cookies)";

- "Develop[ing], support[ing] or us[ing] software, devices, scripts, robots, or any other means or processes … to scrape or copy the Services, including profiles and other data from the Services";

- Overrid[ing] any security feature or bypass[ing] or circumvent[ing] any access controls or use limits of the Services (such as search results, profiles, or videos)

- "Copy[ing], us[ing], display[ing] or distribut[ing] any information (including content) obtained from the Services … without the consent of the content owner (such as LinkedIn for content it owns)";

- "Disclos[ing] information that you do not have the consent to disclose";

- "Violat[ing] the intellectual property or other rights of LinkedIn";

- "Rent[ing], leas[ing], loan[ing], trad[ing], sell[ing]/re-sell[ing] or otherwise monetiz[ing] the Services or related data or access to the same, without LinkedIn's consent.";

- "Us[ing] bots or other unauthorized automated methods to access the Services, add or download contacts, send or redirect messages, create, comment on, like, share, or re-share posts, or otherwise drive inauthentic engagement";

- "Overlay[ing] or otherwise modify[ing] the Services or their appearance";

- "Interfer[ing] with the operation of, or plac[ing] an unreasonable load on, the Services"

48.     Section 8.2(17) of the User Agreement also prohibits members from "viola[ting] the Professional Community Policies."  The policies provide, in relevant part:

> **Do not create a fake profile or falsify information about yourself:**  We don't allow fake profiles or entities.  Do not post misleading or deceptive information about yourself, your business … [d]o not use or attempt to use another person's LinkedIn account or create a member profile for anyone other than yourself.

49.    LinkedIn also maintains a branding policy.[10]   The branding policy states that LinkedIn "generally does not permit its members … to use its name, trademarks, logos, web pages, screenshots and other brand features" absent prior approval.  The branding policy further explains that certain requests, including requests to "[u]se our trademarks on promotional materials that [members] are distributing or selling" or to "[u]se our trademarks in a way that implies affiliation with or endorsement by LinkedIn of [members'] products or services" violate LinkedIn's terms, and therefore are never approved.

50.    For years, Defendants have been on notice of and agreed to abide by these and other prohibitions in registering for and using LinkedIn's services.  As demonstrated below, Defendants have engaged in a systematic pattern of conduct in violation and breach of these terms, causing harm to LinkedIn.

**LinkedIn's Technical Defenses**

51.    LinkedIn also works hard to protect the integrity and security of its platform.  Among other precautions, LinkedIn employs an array of technological safeguards and barriers designed to detect and restrict fake accounts and to prevent data scrapers, bots, and other automated systems from accessing and copying its members' data.  Specifically, LinkedIn has dedicated teams of engineers whose full-time job is to detect and restrict fake accounts, detect and prevent scraping, and to maintain LinkedIn's technical defenses.  It employs many different technical defenses that are constantly operating, including rate limiters, IP address blocks, artificial intelligence models, and proprietary algorithms to detect and block scraping.

52.    LinkedIn's technical measures are important to ensuring that the website is available to and used by legitimate users, and that members feel safe sharing personal information on LinkedIn's platform.  To that end, LinkedIn has used, and will continue to use, commercially reasonable techniques for safeguarding the security of members' data.  In marketing their products, Defendants acknowledge that LinkedIn's technical defenses make it "notoriously

---

[10] https://brand.linkedin.com/policies (last accessed Jan. 10, 2025).

difficult to get access to LinkedIn data," which LinkedIn safeguards "to protect the privacy of their users."[11]

**Defendants' Products Rely on Data Scraped from LinkedIn and Use a Network of Fake Accounts to Conduct Logged-In Scraping**

53.     Defendants offer three related products, each of which centers around scraped LinkedIn data: (1) Proxycurl APIs that scrape LinkedIn data and feed their LinkDB product; (2) LinkDB, which is a database Defendants advertise as containing hundreds of millions of scraped LinkedIn profiles; and (3) Sapiengraph, which provides a web app, a Google sheet plugin that imports scraped LinkedIn data, and a Chrome web-browser extension that offers a scraping powered "Job Change Monitor."

54.     Defendants' logged-in scraping scheme works as follows.  Using automated tools, they create thousands of dummy email addresses through shell domains, such as "skotas[.]com," "myswaero[.]com," "Giga101[.]com," "thewebquest[.]com," "tiamart[.]com," and "Jpohang[.]com."  Defendants then use those dummy email addresses to create accounts on LinkedIn, likely in an automated way, evading LinkedIn's technical defenses in the process. These accounts are registered under false names and use stock images as profile photos.  Upon information and belief, Defendants have used hundreds of thousands of these accounts as part of their scheme.  Defendants have continued to increase the rate at which they create these fake accounts.

55.     These fake accounts generally are detected by LinkedIn's technical defenses and restricted within about a day.  But in that day, they are able to scrape dozens of LinkedIn profiles each.  Undeterred, Defendants continue their scheme day after day, setting up new accounts faster than LinkedIn can restrict those that it detects.  These fake accounts—registered under false names by dummy email addresses—appear to exist for the sole reason of scraping member data from real people.  It does not appear that Defendants' fake accounts appeal for reinstatement after LinkedIn

---

[11] https://nubela.co/blog/all-50-types-of-linkedin-data-you-can-get-youll-be-surpised/ (last accessed Jan. 10, 2025).

restricts them, underscoring that they do not belong to real people.

56.    Defendants openly admit to scraping LinkedIn members' data.  Nubela advertises on its website that it offers a LinkedIn Profile Scraper that is "fast, scalable, [and] well-documented and designed."[12]  Its primary offering is an application that enables users to scrape data from LinkedIn in real-time.  They brag that they can "scrape 1 million LinkedIn profiles in a day."[13]

57.    Proxycurl's website also provides documentation for its application, which includes samples of computer code that Proxycurl's customers may use to obtain full profile data for LinkedIn members, including information that members have chosen to make available for viewing only by other legitimate, logged-in members.  On its website, Proxycurl explains how its product compares favorably to other "Top LinkedIn Scrapers," in part because of its "data freshness guarantee" ensuring that member profile data provided is "less than 29 days old" if not scraped live.[14]  Proxycurl touts a database consisting of "472,880,151 (and increasing) LinkedIn profiles"[15] and over 19 million company profiles.[16]

58.    Marketing materials authored by Defendant Goh, which prominently feature LinkedIn's registered graphic logo mark, describe how buyers can use data scraped from LinkedIn through Proxycurl to "enrich" otherwise limited personal profiles:

---

[12] https://nubela.co/proxycurl/linkedin (last accessed Jan. 10, 2025).
[13] https://nubela.co/blog/is-linkedin-scraping-gdpr-compliant/ (last accessed Jan. 10, 2025).
[14] https://nubela.co/blog/reviewing-top-linkedin-scraping-api-services/ (last accessed Jan. 10, 2025); https://nubela.co/blog/how-fresh-are-profiles-returned-by-proxycurl-api/ (last accessed Jan. 10, 2025).
[15] https://nubela.co/proxycurl/linkdb (last accessed Jan. 10, 2025).
[16] https://nubela.co/proxycurl/linkedin (last accessed Jan. 10, 2025).



Other marketing materials on Proxycurl's website authored by Defendant Goh describe Goh using scraped LinkedIn data for personal benefit, and advertise Proxycurl as a means by which others can do the same:



Further, Proxycurl's website contains prominent admissions of scraping, displaying code exemplifying the type data that that Defendants' application enables buyers to collect:



59.     In addition, it is evident that Defendants are scraping while logged in, not only because they use logged-in fake profiles to scrape, but also because Defendants scrape the profiles of members that have configured their profile settings to restrict the visibility of their entire profile to logged-in members only.  This renders Defendants' statements that they "scrape only public profiles" false.

60.     Defendants know that their scraping is unlawful.  Proxycurl's website contains extensive materials discussing the legality of scraping data on LinkedIn.  Defendants caution that "lines are blurred should you choose to scrape another's website, ***without their explicit permission or in disregard of their Terms of Service (ToS)***.  This is where things become a little tricky. ***Freely extracting data from another site could be argued as trespassing or theft***."[17]  Defendants openly acknowledge that data scraping can cause substantial harm to website owners "***because scrapers are infringing on copyrights and trademarks***, or because they slow down the servers, negatively impacting their revenue streams."[18]

---

[17] https://nubela.co/blog/is-linkedin-scraping-legal/#what-now-can-i-scrape-linkedin (last accessed Jan. 10, 2025) (emphasis added).
[18] *Id.* (emphasis added).

61.    Defendants are aware that "very clear evidence" that scraping is unlawful is "creation of fake accounts to access otherwise-inaccessible users' data."[19]  Yet this is exactly what Defendants are doing: scraping LinkedIn profiles with fake logged-in accounts.  Defendants aptly summed it up: "Clearly fraudulent activities are a big no-no in web scraping."[20]  They even offer the "general advice" that "[a]sking permission is probably a good idea" and "[r]espect the website's Terms of Service."[21]

62.    Defendants fail to follow their own advice.  Despite awareness of the illegality and harmfulness of their actions, Defendants continue to engage in logged-in scraping.

63.    To respond to the extensive number of fake accounts created by Defendants, LinkedIn has had to expend substantial human, financial, and technical resources, including hundreds of hours of employee time.  LinkedIn is unable to disable all of these accounts before they can conduct some scraping activity despite best efforts.  As a result, by the time LinkedIn is able to identify and restrict the access of fake accounts created by Defendants, considerable data has been scraped.  Tellingly, LinkedIn's investigation to date indicates that not a single one of Defendants' fake accounts that LinkedIn has detected has applied for reinstatement after being restricted.

64.    Defendants then sell the data that they scrape.  Proxycurl sells over two dozen fields of LinkedIn member data, including members' names, locations, industries, work experience, education, languages, awards, membership, and certifications.  In their efforts to exploit LinkedIn member data for profit, Defendants have scraped millions of members' profiles.

65.    Defendants have accessed LinkedIn's website as visitors and scraped data from numerous LinkedIn pages accessible to non-members, and have also accessed LinkedIn's website as logged-in members and scraped data from numerous LinkedIn pages not accessible to non-members, in both cases violating LinkedIn's User Agreement, including the prohibitions on "scrap[ing] or copy[ing] the Services, including profiles and other data from the Services," among

---

[19] *Id.*
[20] *Id.*
[21] *Id.*

other provisions, and specifically in the logged-in case, the prohibition on "Creat[ing] a false identity on LinkedIn, misrepresent[ing] your identity, or creat[ing] a Member profile for anyone other than yourself (a real person)."  Defendants were on notice of these conditions and knowingly violated them in engaging in their prohibited conduct.  Defendants have also circumvented the many technical measures and barriers LinkedIn has in place to prevent such scraping activities.

**Defendants Use LinkedIn's Trademarks To Market Their Scraping Services**

66.     Defendants have prominently featured the LinkedIn Marks in marketing materials for their scraping services, without LinkedIn's consent and in disregard of LinkedIn's trademark rights.  The following advertisement, authored by Defendant Goh and posted on November 29, 2023, features LinkedIn's "IN" logo mark:



Similarly, marketing materials published on April 9, 2024, advertising use cases for Proxycurl, also prominently display LinkedIn's "IN" logo mark:



Further, marketing materials published on October 18, 2024, which purport to offer a guide to LinkedIn's services and which promote Proxycurl's application, feature LinkedIn's "IN" logo mark:

67.     LinkedIn has had no part in the design, marketing, offering for sale, or sale of the data scraping application created by Defendants.  Nor is LinkedIn associated, affiliated, or otherwise connected with Proxycurl in any way.

68.     Defendants did not have permission or authorization from LinkedIn to use the LinkedIn Marks.  Defendants were aware at all relevant times that they did not have permission or authorization, and their use of the LinkedIn Marks was willful.

69.     Defendants' use of the LinkedIn Marks causes and is likely to cause an unwanted association between LinkedIn's products and Defendants' illicit scraping activities, tarnishing the LinkedIn Marks.  Privacy and member control of personal data are central to LinkedIn's creation of an environment where members feel comfortable sharing their professional identities and engaging with their networks online.  In furtherance of that interest, LinkedIn offers members choices about the data that LinkedIn collects, uses, and shares, and maintains a detailed Privacy Policy.  Defendants' use of the LinkedIn Marks undermines LinkedIn's reputation for privacy, as well as the substantial goodwill that LinkedIn has accrued, by associating LinkedIn's products with services that scrape data without members' consent and sell it to whomever is willing to pay for it.

70.     Defendants' use of the LinkedIn Marks in their marketing materials violates the Lanham Act's prohibitions on trademark dilution.  Defendants' conduct also breaches the User Agreement's condition prohibiting users from "[v]iolating the intellectual property or other rights of LinkedIn."  Defendants were on notice of both this condition and LinkedIn's branding policy.

**Defendants Make Prohibited Modifications to LinkedIn's Website's Appearance**

71.     Defendants Goh and Le have engaged in and continue to engage in widespread modification of LinkedIn's website's appearance through the Sapiengraph Job Change Monitor ("the Sapiengraph Extension"), a browser extension of Defendant Proxycurl available through the Chrome Web Store, causing harm to LinkedIn.

72.     The Sapiengraph Extension modifies LinkedIn's website by injecting third-party interactive elements into the webpage code for LinkedIn's search results and member profiles.

Interactions with the injected elements mark individual member profiles for targeting by Defendants' data scraping applications.[22]

73.    In creating and registering their personal accounts, and in creating and maintaining Company Pages, Defendants were put on notice of the access and use restrictions in LinkedIn's User Agreement and agreed to abide by those conditions.  Defendants' use and distribution of the Sapiengraph Extension violates LinkedIn's User Agreement, including the prohibitions on "overlay[ing] or otherwise modify[ing] the Services or their appearance," and "Interfer[ing] with the operation of, or plac[ing] an unreasonable load on, the Services," among other provisions. Defendants were on notice of these conditions and knowingly violated them in engaging in their prohibited conduct.

### Defendants Have Caused and Threaten Past and Ongoing Injury to LinkedIn

74.    By engaging in the activities described above, Defendants have caused, and if not halted will continue to cause, ongoing and irreparable harm to LinkedIn, in a variety of ways, including ongoing and irreparable harm to its consumer goodwill.

75.    LinkedIn's members entrust to LinkedIn their data, including professional histories, skills and interests on LinkedIn's site, as well as their comments and reactions.  LinkedIn will suffer ongoing and irreparable harm to its consumer goodwill and trust, which LinkedIn has worked hard for years to earn and maintain, if Defendants' conduct continues.

76.    LinkedIn expended significant human, financial, and technical resources, including hundreds of hours of employee time, investigating and responding to Defendants' unlawful activities, including in its efforts to detect the fake accounts that Proxycurl has created in furtherance of its fraud.  Despite these efforts, LinkedIn has not been able to successfully and permanently stop Defendants from continuing their illicit scheme, and thus needs relief from this Court to enjoin Defendants.

### FIRST CLAIM FOR RELIEF

### Breach of Contract

---

[22] https://sapiengraph.com/job-change-monitor (last accessed Jan. 10, 2025).

77. LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

78. Use of the LinkedIn website and use of LinkedIn services are governed by and subject to the User Agreement.

79. LinkedIn members are presented with the User Agreement and must affirmatively accept and agree to the User Agreement to register for a LinkedIn account.

80. At all relevant times, LinkedIn also prominently displayed a link to the User Agreement on LinkedIn's homepage.

81. Defendants were on notice of and agreed to the User Agreement when they created their member profiles on LinkedIn and extensively used the LinkedIn website, including through the creation and maintenance of (i) the Proxycurl and Nubela Company Pages, and (ii) their extensive network of fake accounts.

82. The User Agreement is enforceable and binding on Defendants.

83. Defendants repeatedly accessed the LinkedIn website with knowledge of the User Agreement and all of its prohibitions. Despite their knowledge of the User Agreement and its prohibitions, Defendants accessed and continue to access the LinkedIn website to, among other things, scrape the LinkedIn website in violation of the User Agreement and without the consent of LinkedIn or its members.

84. Defendants' actions, as described above, have willfully, repeatedly, and systematically breached the User Agreement.

85. LinkedIn has performed all conditions, covenants, and promises required of it in accordance with the User Agreement.

86. Defendants' conduct has damaged LinkedIn, and caused and continues to cause irreparable and incalculable harm and injury to LinkedIn.

87. LinkedIn is entitled to injunctive relief, compensatory damages, and/or other equitable relief.

## SECOND CLAIM FOR RELIEF

### Fraud and Deceit (Common Law, Cal. Civ. Code §§ 1572, 1710)

88. LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

89.     Defendants' acts, as alleged, constitute fraud on LinkedIn.  Defendants falsely represent their identities when they create fake LinkedIn accounts, deceiving LinkedIn into activating their fake accounts and granting their fake accounts access to the platform.  They then use these fraudulently obtained accounts to access and scrape member data that they otherwise would not have been able to access.

90.     Defendants are aware that their representations are false.  They know that they are creating accounts under false names or the names of other people, and they know that LinkedIn has relied on these false representations.

91.     Defendants specifically intended that LinkedIn would rely on their false representations in granting Defendants' access to its platform.

92.     In addition, LinkedIn relies on members to accurately portray themselves on LinkedIn's platform in order to maintain an environment where members feel safe sharing personal and career information.  Reliance on accurate representations by its members is critical to the trust and goodwill that LinkedIn has worked hard to create.  LinkedIn's reliance is justifiable.

93.     As detailed above, Defendants' behavior has damaged and threatens ongoing injury to LinkedIn if not enjoined.  LinkedIn's reliance on Defendants' false representations is a substantial factor in causing LinkedIn's harm.

## THIRD CLAIM FOR RELIEF

### Breach of the Computer Fraud and Abuse Act (18 U.S.C. § 1030)

94.     LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

95.     LinkedIn brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030(g) (the "CFAA").

96.     Defendants have violated the CFAA by knowingly accessing a protected computer, without authorization in violation of § 1030(a)(2).  Defendants have also violated § 1030(a)(4) by knowingly and with the intent to defraud accessing a protected computer without authorization, and by means of such conduct obtaining one or more things of value (namely, data stored on LinkedIn).

97.    LinkedIn members have provided data to LinkedIn.  That data was then stored on LinkedIn's servers, which are protected computers under 18 U.S.C. § 1030(e)(2) as they are used in or affect interstate commerce.  The data was accessible to only those who made accounts with LinkedIn in accordance with LinkedIn's User Agreement.

98.    Defendants were never validly given authorization to access the data provided to LinkedIn that is behind LinkedIn's password wall.  Instead, Defendants obtained authorization fraudulently, through the creation of an extensive network of fake accounts that then scrape behind LinkedIn's password wall.  These accounts are created through misrepresentations.  Defendants then accessed that data without authorization, knowing the data was accessible only according to LinkedIn's User Agreements, and that Defendants did not have valid authorization to access it. Defendants used the personal data they obtained in furtherance of their unlawful scraping operations, and have continued to make such data available to third-parties for purchase.

99.    LinkedIn has suffered losses as a result of these violations amount to well over $5,000 aggregated over a one-year period, including, without limitation:

a.    amounts expended attempting to conduct internal technical investigations in efforts to ascertain the nature and scope of Defendants' unauthorized access to the data; and

b.    significant employee resources and time to participate and assist in those investigations; and

c.    substantial human, financial, and technical resources to disable Defendants' network of fake accounts and attempt to prevent Defendants' further access to LinkedIn's website; and; and

d.    attorneys' fees in aid of those investigations and in enforcing the relevant User Agreements.

100.    Pursuant to 8 U.S.C. § 1030(g), LinkedIn is entitled to recover its losses and obtain injunctive relief prohibiting those Defendants from further violations of the CFAA and to prohibit those Defendants from using the data they obtained by accessing the data without authorization.

**FOURTH CLAIM FOR RELIEF**

**Unlawful, Unfair or Fraudulent Business Practices**

**(Cal. Bus. & Prof. Code § 17200 et seq.)**

101.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

102.    Defendants' actions described above constitute unlawful, unfair, or fraudulent acts or practices in the conduct of a business, in violation of California's Business and Professions Code Section 17200, et seq., including because Defendants deceived LinkedIn into providing it access to, and information from, the personal data of LinkedIn members.

103.    Defendants' data collection technology and its data scraping tools deliberately misrepresented requests sent to the LinkedIn website.  Specifically, Defendants created accounts using dummy email addresses and fake names in order to pose as legitimate LinkedIn users to send queries to LinkedIn's servers.  Defendants did this in order to evade LinkedIn's technical defenses, which are designed to prevent unauthorized access of its computer servers.  Defendants conducted these harmful scraping activities while logged in through an extensive network of fake accounts they have registered and maintained.

104.    This fraudulent scheme has allowed Defendants to conduct their illicit scraping and further their scheme in a way that they otherwise would not have been able to accomplish had they accessed LinkedIn using non-fraudulent means.  Defendants are on notice that their scheme is fraudulent as when their fake accounts are restricted, they cease using them (as they are unable to do so) and not a single one of their fake accounts has applied for reinstatement.  Defendants simply make more.

105.    Scraping data, creating fake accounts, and circumventing LinkedIn's ability to police its own platform has caused substantial injury to LinkedIn, in the form of costs to investigate, remediate, and prevent Defendants' wrongful conduct, among other injuries.

106.    As a result of Defendants' various acts and omissions, LinkedIn has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## FIFTH CLAIM FOR RELIEF

### Dilution by Tarnishment (15 U.S.C. § 1125(c))

107.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

108.    The LinkedIn Marks are famous and distinctive.  The Marks were famous and distinctive before Defendants began to use them in commerce.

109.    Defendants' commercial use of the LinkedIn Marks in their marketing materials is likely to cause an unwarranted association between Defendants' illicit activities and the LinkedIn Marks that creates negative associations with LinkedIn and tarnishes the LinkedIn Marks.  As noted above, LinkedIn's transparent information about how members' data is collected and used, as well as members' choices regarding their data, is central to LinkedIn's business.  Defendants' products, developed through violation of Defendants' contractual obligations, threaten members' privacy and autonomy, and interfere with members' reasonable expectations that LinkedIn will continue to protect their data privacy choices.  Defendants distribute code their customers may use to obtain full profile data for LinkedIn members – including information that members have chosen to make available for viewing only by other legitimate, logged-in members – undermining LinkedIn's Privacy Policy and members' choices and user settings, which give members ultimate control over their information, and Defendants promote such code with the unauthorized use of the LinkedIn Marks.  This association of privacy violations with the LinkedIn Marks harms LinkedIn's reputation and tarnishes its marks.

110.    Defendants' conduct has caused and will continue to cause immediate and irreparable injury to LinkedIn, including its business, reputation, and goodwill.

111.    LinkedIn is entitled to injunctive relief pursuant to 15 U.S.C. § 1125(c)(5).

112.    Because Defendants willfully intended to trade on LinkedIn's reputation and goodwill, LinkedIn is entitled to damages, enhanced damages, fees, and costs pursuant to 15 U.S.C. § 1117(a).

### SIXTH CLAIM FOR RELIEF

#### Misappropriation

113.    LinkedIn realleges and incorporates by reference all of the preceding paragraphs.

114.    LinkedIn has invested substantial time, labor, skill, and financial resources into the creation and maintenance of LinkedIn, its computer systems and servers, including system and server capacity, as well as the content on the LinkedIn website, which is time sensitive.

Defendants have invested none of their own time and resources into developing and building the LinkedIn website and platform.

115.    Disregarding the prohibitions set forth in LinkedIn's User Agreement of which they have been on notice and to which they have expressly consented, and in circumvention of various technical barriers, Defendants, without authorization, have wrongfully accessed LinkedIn's website, computer systems and servers, and obtained data from the LinkedIn site.  The data that Defendants took included time-sensitive updates to member profiles.

116.    Defendants' appropriation and use of this data was at little or no cost to Defendants, without them having to make the substantial investment in time, labor, skill, and financial resources made by LinkedIn in developing the LinkedIn website and platform.  In other words, Defendants have reaped what they have not sown.  Defendants' use of LinkedIn's computer systems and servers, including member data from the LinkedIn site and system and server capacity, constitutes free-riding on LinkedIn's substantial investment of time, effort, and expense.

117.    As a result of this misappropriation, LinkedIn has been forced to expend additional time and resources, including but not limited to, investigating and responding to Defendants' activities.

118.    LinkedIn has been and will continue to be damaged as the result of Defendants' acts of misappropriation.

119.    LinkedIn has suffered and will continue to suffer irreparable injury, and its remedy at law is not itself adequate to compensate it for injuries inflicted by Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, LinkedIn prays that judgment be entered in its favor and against Defendants, as follows:

120.    A permanent injunction enjoining and restraining all Defendants, their employees, representatives, agents, and all persons or entities acting in concert with them during the pendency of this action and thereafter perpetually from

      a.     accessing or using LinkedIn's website, servers, systems, and any data displayed or stored therein, including through scraping and crawling technologies or through creating fake accounts, for any purpose whatsoever; and

      b.     extracting and copying data appearing on LinkedIn's website to their own servers or systems or those controlled by them; and

      c.     using the LinkedIn Marks in commerce.

121.    An order requiring Defendants to destroy all documents, data, and other items, electronic or otherwise, in their possession, custody, or control, that were wrongfully extracted and copied from LinkedIn's website, along with any data that Defendants have inferred, aggregated, or synthesized as a result of data wrongfully extracted and copied from LinkedIn's website;

122.    An order requiring Defendants to destroy all software code and other instrumentalities for scraping LinkedIn's platform;

123.    An order requiring Defendants to notify all customers that purchased or otherwise acquired access to scraped data from LinkedIn of any decision or award against Defendants;

124.    An award to LinkedIn of damages, including, but not limited to, compensatory, statutory, enhanced damages, profits of Defendants, and/or punitive damages, as permitted by law;

125.    An award to LinkedIn of its costs of suit, including, but not limited to, reasonable attorney's fees, as permitted by law; and

126.    Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

LinkedIn hereby demands a jury trial of all issues in the above-captioned action that are triable to a jury.

DATED:  January 24, 2024          MUNGER, TOLLES & OLSON LLP

By:     /s/ *Nicholas D. Fram*

NICHOLAS D. FRAM
Attorney for LinkedIn Corporation